**PERKINS COIE LLP**
Jasmine W. Wetherell (Cal. Bar No. 288835)
JWetherell@perkinscoie.com
1888 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

David J. Burman (*pro hac vice*)
DBurman@perkinscoie.com
Eric J. Weiss (*pro hac vice*)
EWeiss@perkinscoie.com
Mallory Gitt Webster (*pro hac vice*)
MWebster@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Defendant
NINTENDO OF AMERICA INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| LUZ SANCHEZ, DOLLY VIERRA, and minors M.S. and A.D., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NINTENDO OF AMERICA INC.,<br><br>Defendant. | Case No. 3:20-cv-06929-WHA<br><br>**REPLY IN SUPPORT OF NINTENDO OF AMERICA INC.'S MOTION TO COMPEL ARBITRATION OR TRANSFER AND TO DISMISS**<br><br>Date: February 25, 2021<br>Time: 8:00 a.m.<br>Courtroom: San Francisco Courthouse, Courtroom 12<br>Judge: Hon. William Alsup |

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................................ 1

II. ARGUMENT .................................................................................................................... 2

   A.  Plaintiffs Cannot Rely on Declarations that Contradict the Allegations in
       Their Complaint ................................................................................................... 2

   B.  Even the Contradictory Allegations Do Not Change the Fact that Sanchez
       and Vierra Agreed to the EULA ........................................................................... 3

   C.  Sanchez and Vierra Agreed to Mandatory Venue in King County,
       Washington ........................................................................................................... 6

   D.  If the Court Does Not Transfer the Action, Sanchez and Vierra Must
       Arbitrate Their Claims ......................................................................................... 9

   E.  M.S. and A.D.'s Purported Disaffirmation Is a Question of Contract
       Enforceability—Not Formation—that Is Delegated to the Arbitrator ................ 9

   F.  In any Event, M.S. and A.D. Have Not Shown that They Validly
       Disaffirmed Any Agreement ............................................................................... 12

   G.  M.S. and A.D.'s New and Untenable Theories of Standing Do Not Permit
       Them to Withstand Dismissal ............................................................................. 14

III. CONCLUSION .............................................................................................................. 15

1

## TABLE OF AUTHORITIES

2
                                              **Page**

3
**CASES**

4

*Amalgamated Transit Union, Local 1756, AFL–CIO v. Super. Ct.*,
   46 Cal.4th 993 (Cal. Ct. App. 2009) ...................................................................15

5

6
*Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*,
   407 F. Supp. 3d 1051 (D. Haw. 2019) ..................................................................3

7

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
   571 U.S. 49 (2013) ................................................................................................7

8

9
*Biodiversity Legal Found. v. Badgley*,
   309 F.3d 1166 (9th Cir. 2002).............................................................................14

10

*Burgoon v. Narconon of Northern California*,
   125 F. Supp. 3d 974 (N.D. Cal. 2015) ...............................................................11

11

12
*C.M.D. ex rel. De Young v. Facebook, Inc.*,
   621 F. App'x 488 (9th Cir. 2015) .......................................................................13

13

14
*Carbajal v. Nintendo of Am. Inc.*,
   No. 2:20-cv-01694-TSZ, Dkt. (Nov. 20, 2020) (W.D. Wash.)............................8

15

16
*Carusone v. Nintendo of Am. Inc.*,
   2020 WL 3545468 (N.D. Ala. June 30, 2020) .....................................................9

17
*Cray, Inc. v. Raytheon Co.*,
   2016 WL 3254997 (W.D. Wash. June 13, 2016)..................................................9

18

19
*Ctr. for Food Safety v. Vilsack*,
   2015 WL 5915409 (N.D. Cal. Oct. 9, 2015).........................................................3

20

21
*Dagher v. Ford Motor Co.*,
   238 Cal. App. 4th 905 (Cal. Ct. App. 2015) ......................................................14

22
*Diaz v. Nintendo of Am. Inc.*,
   2020 WL 996859 (W.D. Wash. Mar. 2, 2020) ....................................................9

23

24
*Diaz v. Nintendo of Am. Inc.*,
   No. C19-1116 TSZ, ECF No. 38 (Dec. 29, 2020) (W.D. Wash).....................7, 8

25

26
*Doe v. Epic Games, Inc.*,
   435 F. Supp. 3d 1024 (N.D. Cal. Jan. 23, 2020)...........................................11, 13

27
*Dubee v. P.F. Chang's China Bistro, Inc.*,
   2010 WL 3323808 (N.D. Cal. Aug. 23, 2010)......................................................7

28

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

4

*G.G. v. Valve Corporation*,
    799 F. App'x at 558 ..............................................................................................6, 10, 14

5

6

*Goliger v. AMS Properties, Inc.*,
    123 Cal. App. 4th 374 (Cal. Ct. App. 2004) ...................................................................5

7

*Heidbreder v. Epic Games, Inc.*,
    438 F. Supp. 3d 591 (E.D.N.C. 2020) .............................................................................5

8

9

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ..........................................................................................................10

10

*Hurry v. Fin. Indus. Regulatory Auth., Inc.*,
    782 F. App'x 600 (9th Cir. 2019) ....................................................................................9

11

12

*I.B. by & through Bohannon v. Facebook, Inc.*,
    82 F. Supp. 3d 1115 (N.D. Cal. 2015) .....................................................................13, 15

13

14

*In re Apple In-App Purchase Litigation*,
    855 F. Supp. 2d 1030 (N.D. Cal. 2012) ...................................................................11, 14

15

*In re Fluidmaster*,
    149 F. Supp. 3d 940 (N.D. Ill. 2016) ............................................................................14

16

17

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*,
    298 F. Supp. 3d 1285 (N.D. Cal. 2018) ...........................................................................4

18

19

*In re Schugg*,
    688 F. App'x ...................................................................................................................14

20

*In re Schugg*,
    688 F. App'x 477 (9th Cir. 2017) ....................................................................................3

21

22

*In re Sony Gaming Networks & Customer Data Security Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ...........................................................................14

23

24

*In re StockX Customer Data Sec. Breach Litig.*,
    2020 WL 7645597 (E.D. Mich. Dec. 23, 2020).............................................................12

25

*Ingram v. Neutron Holdings, Inc.*,
    467 F. Supp. 3d 575 (M.D. Tenn. 2020) ........................................................................12

26

27

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000)............................................................................................8

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Karl v. Zimmer Biomet Holdings, Inc.*,
4        2018 WL 5809428 (N.D. Cal. Nov. 6, 2018) (Alsup, J.)...........................................................9

5    *Lopez v. Kmart Corp.*,
        2015 WL 2062606 (N.D. Cal. May 4, 2015) ........................................................................11

6
7    *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
        89 Cal. App. 4th 1042 (Cal. Ct. App. 2001) .........................................................................4

8    *Mayron v. Google LLC*,
9        269 Cal.Rptr.3d 86 (Cal. Ct. App. 2020) ............................................................................14

10   *Murphy v. DirecTV, Inc.*,
         2011 WL 3319574 (C.D. Cal. Aug. 2, 2011), *aff'd in relevant part by* 724 F.3d
11       1218 (9th Cir. 2013).................................................................................................................4

12   *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
         165 F. Supp. 3d 937 (S.D. Cal. 2016) .................................................................................15
13
     *Plymouth Cty. Ret. Sys. v. Model N, Inc.*,
14       2015 WL 65110 (N.D. Cal. Jan. 5, 2015) ............................................................................10

15   *R.A. v. Epic Games*,
16       2019 WL 6792801 (C.D. Cal. July 30, 2019) ................................................................7, 8, 13

17   *Schauer v. Mandarin Gems of Cal., Inc.*,
         125 Cal.App.4th 949 (Cal. Ct. App. 2005) .........................................................................15
18
     *Three Valleys Municipal Water District v. E.F. Hutton & Co.*,
19       925 F.2d 1136 (9th Cir. 1991).........................................................................................10, 11

20   *Trans-Tec Asia v. M/V Harmony Container*,
21       518 F.3d 1120 (9th Cir. 2008)........................................................................................12, 13

22   *Velasquez-Reyes v. Samsung Elecs. Am., Inc.*,
         2020 WL 6528422 (C.D. Cal. Oct. 20, 2020) .......................................................................5
23
     *Vergara v. Nintendo of Am. Inc.*,
24       2020 WL 2571903 (N.D. Ill. May 21, 2020) .........................................................................9

25   *W. Consultants, Inc. v. Davis*,
26       310 P.3d 824 (Wash. Ct. App. 2013) ....................................................................................4

27   *Wilton Reassurance Life Ins. Co. of N.Y. v. Metoyer*,
         2010 WL 11515323 (C.D. Cal. Jan. 22, 2010) ...................................................................13

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

S<small>TATUTES</small>

4

28 U.S.C. § 1291 ..............................................................................................................7

5

28 U.S.C. § 1404(a) ......................................................................................................7, 8

6

Cal. Civ. Code § 1556 ...................................................................................................11

7

Cal. Civ. Code § 1557 ...................................................................................................11

8

Cal. Fam. Code § 6710 ..................................................................................................11

9

Cal. Fam. Code § 6710 ..................................................................................................11

10

Song-Beverly Act ..........................................................................................................14

11

Wash. Rev. Code § 26.28.030 .................................................................................11, 13

12

Wash. Rev. Code § 26.28.040 ......................................................................................13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.     INTRODUCTION

2    This action was initiated to avoid the same result that three federal courts reached within

3    the last year: enforcing purchasers' agreements to Nintendo's EULA and under those agreements

4    compelling to arbitration claims involving the same allegations as those asserted here. In response

5    to Nintendo's Motion, Sanchez and Vierra have doubled-down on their attempts to avoid their

6    agreement to the EULA. They improperly introduced several new "facts," all of which attempt to

7    walk back allegations in their Complaint or add details that contradict those allegations. They

8    assert, for example, that their counsel erred by alleging that Sanchez and Vierra purchased their

9    Switch consoles for personal use, that they are not actually asserting all of the causes of action in

10   the Complaint, and that they now assign their rights in order to create standing for M.S. and A.D.

11   where there is none.

12    From there, Sanchez and Vierra contend that they did not agree to the EULA, but they did

13   so twice, receiving on-the-packaging notice of the EULA and an opportunity to review the EULA

14   before ever purchasing or using the Switch and by authorizing M.S. and A.D. to set up the Switch

15   consoles, which again required acceptance of the EULA. Sanchez and Vierra otherwise do not

16   assert that either the forum-selection clause or arbitration provision are invalid (nor could they).

17    For their part, M.S. and A.D. offer no persuasive argument that they can disaffirm their

18   parents' agreement to the EULA to facilitate Sanchez and Vierra avoiding transfer and

19   arbitration. Nor have they demonstrated that they are instead the parties to an agreement with

20   Nintendo or that, even if the Court concludes they are, they can maintain their claims in this

21   Court. Their purported disaffirmation of any agreement is not a contract-formation issue for this

22   Court to decide; an abundance of case law and M.S. and A.D.'s own allegations confirm that

23   disaffirmation is a question of contract enforceability that they delegated to an arbitrator for

24   resolution. Moreover, M.S. and A.D. have also not shown that their purported disaffirmation is

25   valid, as they again mistake contract enforceability for contract formation, fail to aver that they

26   will not use the Switch consoles in the future, and admit that they allegedly accepted the EULA

27   despite its requirement that users under 18 must have a parent agree. M.S. and A.D. also cannot

28   demonstrate Article III standing or statutory standing via Sanchez's and Vierra's belated attempt

to assign rights and the new allegation that the consoles were gifts.

## II.      ARGUMENT

### A.      Plaintiffs Cannot Rely on Declarations that Contradict the Allegations in Their Complaint.

Sanchez and Vierra now claim that they purchased the Switch consoles for A.D. and M.S.'s exclusive use, not for Sanchez and Vierra's personal use. *See* Opp., ECF No. 37 (Jan. 11, 2021) at 13. They cite a declaration by their counsel who claims that the allegations that Sanchez and Vierra purchased the consoles for "personal, family, *and* household use" were drafting errors that should have read "personal, family, *or* household use." *Id.* (emphasis added); *see also* ECF No. 37-1 (Jan. 11, 2021) ¶ 3.

But their allegation of personal use appeared in both the original and the amended complaints; if the change from *and* to *or* were to correct a mere error and not to materially alter allegations in response to Nintendo's Motion, that error likely would have been corrected in the amended complaint. *See* Compl., ECF No. 1 (Oct. 5, 2020) ¶ 13; Am. Compl., ECF No. 25 (Nov. 3, 2020) ¶¶ 13, 21. The new disjunctive allegation also is inconsistent with Sanchez and Vierra's allegations that they purchased the Switch consoles for their "personal use" as well as "family" and "household" use. Am. Compl., ¶¶ 13, 21. It does not follow that the purchase was intended for personal use but also may have been exclusively for family use or exclusively household use.

Sanchez and Vierra also assert for the first time that they "bring this action largely in their representative capacity on behalf of the minors." Opp. at 1–2. The Complaint, however, does not refer to Sanchez or Vierra as appearing only in that limited capacity. The section of the Complaint that addresses "Parties" lists Sanchez and Vierra, describes their places of citizenship and residency, asserts incorrectly that they are "not a signatory" to the EULA, and does not purport to place any limitations on their roles as parties or to distinguish their litigation roles from those of M.S. and A.D. Am. Compl. ¶¶ 11–25. Moreover, each cause of action is asserted by "Plaintiffs" and contains no language limiting the cause of action to a subset of the Plaintiffs. *Id.* ¶¶ 59, 71, 89, 106, 116, 128, 134. The Complaint simply does not suggest that Sanchez or Vierra intended to limit their causes of action or to assert different claims than M.S. and A.D.

1    Finally, Sanchez and Vierra now purport to "assign" the rights that they have as

2  purchasers of the Switch consoles to M.S. and A.D. in a bid to confer standing for their claims.

3  But Sanchez and Vierra never mentioned an "assignment" in the Complaint, and their

4  declarations make clear that they made the assignments only in response to Nintendo's Motion.

5  Sanchez Decl. ¶ 15 ("I assign my rights as a purchaser and buyer of the Switch and Joy-

6  Cons . . . ."); *see also* Vierra Decl. ¶ 15 (same). Sanchez and Vierra also now contend that the

7  purchases were only intended to be gifts. *See* Opp. at 11. They cannot, however, attempt to

8  manufacture standing after the case has begun and in response to Nintendo's Motion.

9    The Court should reject Sanchez and Vierra's efforts to alter their allegations and change

10 course in response to Nintendo's Motion.[1] *See In re Schugg*, 688 F. App'x 477, 478–79 (9th Cir.

11 2017) (holding that standing is determined as of the beginning of the litigation and rejecting that

12 "changed factual circumstances" provided "the standing necessary"); *Aquilina v. Certain*

13 *Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1051, 1086 (D. Haw. 2019) (refusing

14 to "overlook" supposed "scrivener's error"); *Ctr. for Food Safety v. Vilsack*, 2015 WL 5915409,

15 at *2 (N.D. Cal. Oct. 9, 2015) (holding that "the Court cannot consider factual allegations"

16 regarding standing "raised for the first time in an opposition").

17 **B.    Even the Contradictory Allegations Do Not Change the Fact that Sanchez and Vierra Agreed to the EULA.**

18

19    Relying on their new and improper "facts," Sanchez and Vierra contend that they did not

20 actually agree to the EULA because they did not use the Switch consoles and did not authorize

21 their children to set up the consoles and accept the EULA during that process. *See* Opp. at 22–23.

22    But Sanchez and Vierra do not dispute—because they cannot—that they purchased the

23 consoles; that the exterior packaging of the consoles stated that use would be subject to the EULA

24 and provided a website address to review the EULA; or that as the purchasers, Sanchez and

25 Vierra were in a position to identify the notice and visit the provided website address. Instead,

26 Sanchez and Vierra invoke their counsel's "drafting error" to abandon their allegations that they

27 [1]  In a sentence at the end of their Opposition, Plaintiffs request leave to amend. Opp. at 34. Plaintiffs have not, however, made any attempt to show that they are entitled to amend, and they should not be allowed to do so to avoid their obligations.

28

1   purchased the Switch consoles for their "personal . . . use." *See* Opp. at 22; Am. Compl. ¶¶ 13

2   (alleging purchase was for "personal, family, and household use"), 21 (same). But contrary to

3   Plaintiffs' assertion that "not a single allegation in the FAC states" that Sanchez and Vierra used

4   the Switch, multiple allegations state explicitly that they purchased the consoles for

5   "personal . . . use." Am. Compl. ¶¶ 13, 21. It is therefore not the case, as Sanchez and Vierra

6   contend, that Nintendo "failed to show that [they] used the Products"; rather, Sanchez and Vierra

7   impermissibly changed their allegations in response to Nintendo's Motion. Opp. at 23.

8          Sanchez and Vierra also contend that they cannot be held to their agreement because they

9   did not read the notice. Opp. at 22 n.7. But it is blackletter law that a party cannot avoid the terms

10   of a contract simply because they failed to read those terms. *See W. Consultants, Inc. v. Davis*,

11   310 P.3d 824, 827–28 (Wash. Ct. App. 2013) (holding that "it was not necessary to actually read

12   the agreement in order to be bound by it" (quotations omitted)); *Marin Storage & Trucking, Inc.*

13   *v. Benco Contracting & Eng'g, Inc*., 89 Cal. App. 4th 1042, 1049 (Cal. Ct. App. 2001) ("A party

14   cannot avoid the terms of a contract on the ground that he or she failed to read it before

15   signing."); *Murphy v. DirecTV, Inc*., 2011 WL 3319574, at *2 (C.D. Cal. Aug. 2, 2011) (holding

16   that where plaintiffs did not receive the arbitration agreement when they received service but it

17   was later referenced on receipts and mailed, plaintiffs "were bound by the contract, even if they

18   did not read it"), *aff'd in relevant part by* 724 F.3d 1218 (9th Cir. 2013).

19          Furthermore, Sanchez and Vierra take issue with the location of the notice because they

20   (incorrectly) allege that it was on the "bottom of the packaging," where "neither Parent looked

21   nor was expected to look." Opp. at p. 13 n.7. They offer no support, however, for their position

22   that the placement of the notice alone makes their agreement any less enforceable. *See id.*; *cf. In*

23   *re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1294

24   (N.D. Cal. 2018) (compelling to arbitration plaintiffs who received notice of terms on the "back"

25   of product boxes). In any event, Nintendo reasonably expected purchasers to review the

26   information on the packaging. That is why Nintendo placed the EULA notice on the part of the

27   package that opens to provide access to the Switch and near other important information,

28   including a list of the items included in the package, instructions about setting up and using the

1   console, and a warning for purchasers who have epilepsy or experience seizures. *See* Sanchez

2   Decl. ¶ 7, Ex. A. Sanchez and Vierra simply chose not to review the packaging. *See id.*; Vierra

3   Decl. ¶ 9, Ex. A.

4   But even if Sanchez and Vierra did not agree to the EULA via the notice on the packaging

5   and subsequent use, they agreed through the Switch set-up process. Sanchez and Vierra contend

6   that they did not authorize M.S. and A.D. to set up the Switch because "the Switch belongs to the

7   Minors," but their allegations once again undermine their opposition. Opp. at 23. Sanchez and

8   Vierra gave the consoles to M.S. and A.D. after purchase and allowed them to set up the consoles.

9   Am. Compl. ¶¶ 12–13, 20–21. By doing so, Sanchez and Vierra provided M.S. and A.D. the

10  authority to undertake all acts necessary—including accepting the EULA on their behalf—to

11  complete that process. *See Velasquez-Reyes v. Samsung Elecs. Am., Inc.*, 2020 WL 6528422, at

12  *3 (C.D. Cal. Oct. 20, 2020) (holding that "authority allows agents to do everything necessary or

13  proper and usual . . . for effecting the purpose of his agency" (quotations omitted)).[2]

14  In addition, Sanchez and Vierra ignore that Nintendo reasonably understood that as the

15  purchasers of the consoles and as individuals over the age of 18, Sanchez and Vierra had agreed

16  to the EULA. *See* Opp. at 23. Nintendo was "justified in believing" that whoever set up the

17  consoles that Sanchez and Vierra purchased "possessed the authority to agree to the EULA" and

18  had "no reason to believe that the user of" the consoles "was anyone other than" Sanchez and

19  Vierra. *Heidbreder v. Epic Games, Inc.*, 438 F. Supp. 3d 591, 597 (E.D.N.C. 2020); *see also*

20  *Velasquez-Reyes*, 2020 WL 6528422, at *3 (holding that because the plaintiff asked a "T-Mobile

21  representative to activate" his phone, the plaintiff "delegated authority to agree to arbitration").

22  Sanchez and Vierra instead focus on the irrelevant fact that M.S. and A.D. at some point

23  allegedly "created their own personalized accounts." Opp. at 24. But a purchaser does not create

24  an account during the Switch set-up process and is not required to create an account to use the

25

26  [2]  Sanchez and Vierra's citation to *Goliger v. AMS Properties, Inc.*, 123 Cal. App. 4th 374, 376
    (Cal. Ct. App. 2004) does not change the analysis. Opp. at 23. The *Goliger* court held that the
27  patient's daughter had not exercised authority to bind her mother to an arbitration agreement
    because the daughter had not signed the portions of the agreement designated specifically for
28  an "agent" and the mother had only allowed her daughter to make medical decisions. *Goliger*,
    123 Cal. App. 4th at 377. That is not the situation here.

1    Switch. *See* Kiel Decl., ECF No. ¶¶ 9–18; *see also* Second Declaration of Kristopher Kiel ("2d

2    Kiel Decl.") ¶¶ 3–4.[3] Thus, M.S. and A.D. did not use accounts when accepting the EULA on

3    their parents' behalf during the set-up process. The fact that M.S. and A.D. may have at some

4    other point created accounts did not give notice that anyone other than Sanchez and Vierra had

5    accepted the EULA.[4]  Regardless, M.S. and A.D.'s claims must also be transferred or compelled

6    to arbitration. *See infra* §§ II.C, E–F.

7        Finally, Sanchez and Vierra's reliance on *G.G. v. Valve Corporation* is misplaced. There,

8    the Ninth Circuit held that consistent with the unremarkable principle that parties who have not

9    agreed to a contract are not bound by it, the parent-plaintiffs could not be compelled to

10   arbitration. 799 F. App'x at 558. Unlike Sanchez and Vierra—who twice accepted the EULA—

11   the parents in *G.G.* did not accept the at-issue terms of service. *Id.* Those parents had not

12   purchased products for "personal . . . use" and for which they were notified on exterior packaging

13   that their use required agreement to a license available via a website address. And there is no

14   indication that those parents had authorized their children to set up products or that the company

15   reasonably understood that the parents had agreed to the terms. Moreover, Sanchez and Vierra

16   assert several more claims than just a declaratory judgment the parents in *G.G.* asserted.

17   **C.    Sanchez and Vierra Agreed to Mandatory Venue in King County, Washington.**

18       Sanchez and Vierra also take issue with Nintendo's request to transfer the action, first

19   arguing that they did not agree to the EULA with the mandatory forum-selection clause. But as

20   Nintendo has shown via the notice on the packaging and the setup process, they so agreed twice.

21   *See supra* § II.B. Sanchez and Vierra do not otherwise argue that the clause is unenforceable, and

22   such a position would be contrary to the Supreme Court's dictate that a mandatory forum-

23   selection clause must be "given controlling weight in all but the most exceptional cases." *Atl.*

24

25   [3]  Perhaps realizing that Nintendo would be forced to provide additional information because
     they raise many new facts, Plaintiffs include a footnote citing the Court's notice that "reply

26   declarations are disfavored." Opp. at 6 n.2. Nintendo provides such a declaration only to
     address new issues that Nintendo could not have reasonably anticipated in its Motion.

27   [4]  Even assuming that Sanchez and Vierra could assign their rights as they purport to do, M.S.
     and A.D.'s rights would be the same as those held by Sanchez and Vierra. To hold otherwise

28   would allow any contracting adult to assign rights to a minor who would then disaffirm.

1    *Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59–60 (2013) (quotations

2    omitted). Sanchez and Vierra's arguments about the propriety of "venue" under 28 U.S.C. § 1291

3    are therefore irrelevant in the face of the express forum-selection clause.[5] Opp. at 12.

4         Sanchez and Vierra also argue that the *Diaz* action currently pending in the Western

5    District of Washington should not be considered a first-filed action because the "case is no longer

6    a class action" and this case does not involve the same parties as those in *Diaz*. Opp. at 14. But

7    Judge Zilly specifically declined to dismiss the case, which is a putative class action, and requires

8    regular status updates from the parties. *See, e.g.*, *Diaz v. Nintendo of Am. Inc.*, No. C19-1116

9    TSZ, ECF No. 38 (Dec. 29, 2020) (W.D. Wash). And the putative classes are the same: the *Diaz*

10   action involves a putative class of "[a]ll persons in the United States who bought a Nintendo

11   Switch, stand-alone Joy-Con controllers, or a Nintendo Switch Lite," *id.*, ECF No. 21 (Sept. 27,

12   2019) ¶ 185, and Sanchez and Vierra assert a putative class of "[a]ll persons in the United States

13   who purchased a Nintendo Switch, Joy-Con controllers, or a Nintendo Switch Lite" and an

14   identical California subclass. Am. Compl. ¶ 59. This case is therefore readily distinguishable

15   from the authority that Sanchez and Vierra cite. *See, e.g.*, *Dubee v. P.F. Chang's China Bistro,*

16   *Inc.*, 2010 WL 3323808, at *1 (N.D. Cal. Aug. 23, 2010) (holding that the parties were not the

17   same because the first-filed plaintiff had "not even attempt[ed] to pursue class certification").

18        Sanchez and Vierra also contend that there would be "no benefit to the parties or

19   judiciary" from transferring the action. Opp. at 14. But Judge Zilly is already familiar with the

20   same putative nationwide class of Switch purchasers and the same alleged issues regarding the

21   Switch console, Joy-Con controllers, and Nintendo's EULA. *See, e.g.*, *Diaz v. Nintendo of Am.*

22   *Inc.*, No. C19-1116 TSZ, ECF No. 36 (Mar. 2, 2020) (W.D. Wash). Thus, because the *Diaz* action

23   remains an active case, efficiencies would be gained due to the overlapping issues.

24        Sanchez and Vierra further assert without support that if the case is transferred, "it would

25   most certainly not be coordinated or consolidated with *Diaz*." Opp. at 14. But another recently

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     5   Plaintiffs ignore that although the court in *R.A. v. Epic Games*, 2019 WL 6792801, at *7 (C.D.
         Cal. July 30, 2019), concluded that the minor had disaffirmed the agreement, the court
         nonetheless transferred under Section 1404(a). They also ignore that M.S. and A.D. have not

28       so disaffirmed. *See infra* § II.F.

1  filed action, in which a minor plaintiff asserts a putative class nearly identical to this one, was in
2  fact transferred to Judge Zilly. *See Carbajal v. Nintendo of Am. Inc.*, No. 2:20-cv-01694-TSZ,
3  Dkt. (Nov. 20, 2020) (W.D. Wash.). Thus, the available evidence confirms that transfer to Judge
4  Zilly is expected, not "certainly" unlikely to happen. *See id.* That is also why Nintendo identified
5  the *Carbajal* action as involving the same disaffirmation issues presented here—not to suggest
6  that it is the first-filed action (it plainly is not) but to show that transfer would be beneficial
7  because Judge Zilly is not only handling the same issues raised in the first-filed action but also the
8  same issues specific to minors in a related action. *See id.*, ECF No. 1 (Nov. 17, 2020) ¶ 24.

9  Lastly, Sanchez and Vierra take issue with the fact that Nintendo did not address all
10  possible factors that could conceivably support transfer under Section 1404(a). *See* Opp. at 15.
11  There is no rigid test, however, for the factors to be considered. *See Jones v. GNC Franchising,*
12  *Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000) (listing factors that a court "may consider").

13  Sanchez and Vierra further take issue with Nintendo's discussion of witnesses, contending
14  that Nintendo did not "address the location of non-party witnesses," but they do not identify who
15  could be a relevant non-party witness in this case. Opp. at 17. And that is exactly why Nintendo
16  did not focus on non-party witnesses; at this early stage, Nintendo is also not aware of any such
17  witnesses who might be relevant. Similarly, Nintendo addressed (1) its operations in the Western
18  District of Washington; (2) the employees who work from there in "marketing, selling, and
19  distributing Nintendo products in North America," including the Switch; and (3) the many
20  associates who work there to handle customer inquiries about the Switch system and Joy-Con
21  controllers," Kiel Decl. ¶ 21, because they show that likely Nintendo witnesses and documents
22  will be primarily located in Washington, not California, *see R.A.*, 2019 WL 6792801, at *7
23  (transferring to state of company's headquarters where the design and programming was done).

24  Sanchez and Vierra also contend that California has the greatest interest in this matter and
25  that its courts are the most familiar with California law. Opp. at 19–20. They ignore, however,
26  that Washington also has a significant interest in this action because it involves a Washington
27  company, allegations related to products for which "marketing, selling, and distributing" was
28  conducted from Washington, and a proposed class that includes Washington residents.

Washington courts are also equally capable of applying California law if warranted. *Cray, Inc. v. Raytheon Co.*, 2016 WL 3254997, at *5 (W.D. Wash. June 13, 2016). Sanchez and Vierra also unpersuasively urge the Court to ignore that even in a putative class action, courts have held that the would-be class representative's choice of forum is entitled to less deference and weigh overall convenience in light of a potential "nationwide" class action. *See, e.g.*, *Karl v. Zimmer Biomet Holdings, Inc.*, 2018 WL 5809428, at *5–6 (N.D. Cal. Nov. 6, 2018) (Alsup, J.).

Finally, Sanchez and Vierra attempt to minimize the relative "court congestion" in this District to avoid transfer. Opp. at 20–21. They assert that disposition in the Western District is only "slightly speedier" at 7.2 months from filing than in this District at 11.4 months from filing. *See id.* But the difference is not "slight[]"; rather, according to Sanchez and Vierra's own statistics, the Western District is nearly 60% faster in resolving cases.

**D.      If the Court Does Not Transfer the Action, Sanchez and Vierra Must Arbitrate Their Claims.**

If the Court does not transfer this action, the Court should compel Sanchez and Vierra to individual arbitration as required by the EULA and as enforced by several other courts. EULA at 3; *Diaz v. Nintendo of Am. Inc.*, 2020 WL 996859, at *1 (W.D. Wash. Mar. 2, 2020) (Plaintiffs "agreed to the arbitration provision in Nintendo's [EULA]."); *Vergara v. Nintendo of Am. Inc.*, 2020 WL 2571903, at *1 (N.D. Ill. May 21, 2020) (same); *Carusone v. Nintendo of Am. Inc.*, 2020 WL 3545468, at *2–3 (N.D. Ala. June 30, 2020) (holding that the "terms of the EULA are available for pre-purchase review" via the packaging and that the plaintiff agreed to the terms). Aside from alleging that they did not agree to the EULA, Sanchez and Vierra do not dispute that they are required to arbitrate the claims they assert against Nintendo. *See* Opp. at 21–22. They have therefore conceded that if they agreed to the EULA and the Court does not transfer, they must be compelled to arbitration. *Hurry v. Fin. Indus. Regulatory Auth., Inc.*, 782 F. App'x 600, 602 (9th Cir. 2019) ("Plaintiffs' failure to respond to that argument constitutes waiver.").

**E.      M.S. and A.D.'s Purported Disaffirmation Is a Question of Contract Enforceability—Not Formation—that Is Delegated to the Arbitrator.**

As Nintendo explained in its Motion, because Sanchez and Vierra agreed to the EULA, M.S. and A.D. have not entered into any agreement with Nintendo and there is nothing for them

1    to disaffirm. *See* Mot. at 22–23. But if the Court concludes they agreed to the EULA on their own

2    behalf and does not transfer, their purported disaffirmation has been delegated to the arbitrator.

3         At the outset, M.S. and A.D. do not challenge the enforceability of the delegation

4    provision. Instead, they note in a footnote that some courts have held that the incorporation of the

5    AAA rules alone is insufficient to demonstrate delegation where "unsophisticated parties" are

6    involved. Opp. at 30 n.8. First, courts have concluded that incorporation of the AAA rules is

7    alone sufficient for delegation, even when the parties are "unsophisticated." *See, e.g.*, *G.G.*, 799

8    F. App'x at 558. Second, Nintendo does not rely exclusively on incorporation of the AAA rules;

9    the EULA explicitly says that the parties agree to delegate "all" issues related to "enforceability."

10   EULA at 2; *see also* Mot. at 30. That language alone is sufficient for the Court to find delegation,

11   and Nintendo merely pointed out the incorporation because it reinforces the parties' intent.

12        M.S. and A.D. otherwise assert that their purported disaffirmation is a question of contract

13   formation because they would like the Court, rather than an arbitrator, to decide that question.

14   Opp. at 28–30. But when, as here, an issue addresses not whether an agreement exists in the first

15   place but whether the agreement has been disaffirmed, the question is for the arbitrator when the

16   parties have so delegated it. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

17        That is confirmed by *Three Valleys Municipal Water District v. E.F. Hutton & Co.*, 925

18   F.2d 1136, 1140 (9th Cir. 1991), despite M.S. and A.D.'s attempts to minimize the case.[6] Opp. at

19   30. As Nintendo explained, the Court held that questions about the voidability of contracts, such

20   as "where one party was an infant," are questions for the arbitrator where the parties have, as

21   here, delegated such questions. *Three Valleys*, 925 F.2d at 1140. The Court distinguished that

22   from "challenges going to the very existence of a contract." *See id.* M.S. and A.D. do not "deny

23   the existence of the contract[]," *id.* at 1142; they assert repeatedly that there is a contract with

24   Nintendo, Opp. at 16–17; Am. Compl. ¶¶ 12, 20.

25        M.S. and A.D. also assert incorrectly that minors are incapable of contracting in a bid to

26

27   _____

     [6]  Even if the Court agrees with M.S. and A.D. that this is "dicta," Opp. at 30, Ninth Circuit dicta
     is nonetheless persuasive, *see Plymouth Cty. Ret. Sys. v. Model N, Inc.*, 2015 WL 65110, at *3

28   (N.D. Cal. Jan. 5, 2015) (finding Ninth Circuit dicta "highly persuasive").

1   show that disaffirmation raises a contract-formation issue. *See* Opp. at 28–29. But the law is clear

2   that minors may form contracts, subject to later disaffirmation. *See* Wash. Rev. Code 26.28.030

3   ("A minor is bound . . . by his or her other contracts, unless he or she disaffirms them . . . ."); Cal.

4   Fam Code § 6710[7] ("[A] contract of a minor may be disaffirmed by the minor . . . ."). M.S. and

5   A.D.'s allegations reinforce that conclusion because they repeatedly assert that they agreed to the

6   EULA. *See* Opp. at 16–17; Am. Compl. ¶¶ 12, 20. M.S. and A.D. therefore cannot credibly

7   contend that they did not form an agreement; if they had not done so, there would be nothing for

8   them to so strenuously try to disaffirm.

9       In fact, much of the authority that Plaintiffs cite confirms that disaffirmation does not

10   address contract formation. In *Lopez v. Kmart Corp.*, 2015 WL 2062606, at *4 (N.D. Cal. May 4,

11   2015), for example, the court held that "minors have the capacity to make a contract in the same

12   manner as an adult, subject to the power of disaffirmance." Likewise, in *Doe v. Epic Games, Inc.*,

13   435 F. Supp. 3d 1024, 1035 (N.D. Cal. Jan. 23, 2020), the court concluded that "a minor has the

14   capacity to contract." And the secondary source regarding affirmative defenses that M.S. and

15   A.D. cite makes clear that "incapacity" because of minority must be raised "as a defense to the

16   contract." Opp. at 28. Thus, contrary to M.S. and A.D.'s position, the issue is not whether they

17   can form contracts; the issue is whether they have validly disaffirmed any contracts they formed.[8]

18       Multiple courts have recently confirmed that disaffirmation is *not* an issue of contract

19   formation and that the issue is therefore delegated to an arbitrator when the agreement contains a

20   delegation clause. In *In re StockX Customer Data Sec. Breach Litig.*, 2020 WL 7645597, at *4–5

21   (E.D. Mich. Dec. 23, 2020), the court held that the plaintiffs' contention that they had disaffirmed

---

[7]   M.S. and A.D.'s reliance on California Civil Code § 1556 is misplaced because a later-enacted section of that statute states that minors *can* form contracts. *See* Cal. Civ. Code § 1557 (referring to California Family Code § 6710, which governs the "contract of a minor").

[8]   The other cases that M.S. and A.D. cite do not support their position. *Burgoon v. Narconon of Northern California*, 125 F. Supp. 3d 974, 981 (N.D. Cal. 2015), for example, involved adult plaintiffs who claimed that they had not formed contracts because they lacked the mental capacity to do so while high on heroin or experiencing drug-withdrawal symptoms. The court accordingly ordered a trial to evaluate that issue. *Id.*

And in *In re Apple In-App Purchase Litigation*, 855 F. Supp. 2d 1030, 1036 n.4 (N.D. Cal. 2012), the court cited California Civil Code § 1556, but as Nintendo has explained, *supra* n.7, Section 1557 of that same statute makes clear that minors can form contracts.

the agreements they entered as minors challenged whether the arbitration agreement was enforceable, not whether the agreement had been formed in the first place. The court therefore compelled the plaintiffs to arbitrate their disaffirmation. *Id.* at *6.

The District Court for the Middle District of Tennessee reached the same result in *Ingram v. Neutron Holdings, Inc.*, 467 F. Supp. 3d 575 (M.D. Tenn. 2020). The court held that the plaintiff did "not contest the formation of a contract containing an Arbitration Provision" and instead "contest[ed] the enforceability" of the agreement by attempting to disaffirm it. *Id.* at 581. Because disaffirmation is not a contract-formation issue, the court held that the parties had delegated to the arbitrator whether the minor had validly disaffirmed. *See id.* at 584.

**F.    In any Event, M.S. and A.D. Have Not Shown that They Validly Disaffirmed Any Agreement.**

M.S. and A.D. otherwise argue that their disaffirmation is valid. *See* Opp. at 25–28. They first assert that the EULA's choice of Washington law does not apply because they challenge the formation of any agreement with Nintendo. *Id.* at 25–26. But as Nintendo explained above, M.S. and A.D. are challenging the enforceability of an agreement adopting Washington law, not its formation.[9] *See supra* § II.E.

M.S. and A.D.'s citation to *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120 (9th Cir. 2008) is therefore misplaced. There, the Ninth Circuit held that a choice-of-law provision cannot be applied to "the issue of contract *formation*" because a court must first "decide[] . . . that such a provision was a valid contractual term." *Id.* at 1124 (emphasis added). Here, M.S. and A.D. do not dispute that they entered into an agreement with Nintendo—in fact, they urge the Court to find that they did so—and thus their agreement to apply Washington law addresses whether they have validly disaffirmed that same agreement. That is consistent with how courts address contract enforceability—by applying the parties' chosen law to assess that issue. *See, e.g.*, *I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1121 (N.D. Cal. 2015) (applying the choice-of-law provision to determine whether the minors could disaffirm because the agreement at issue "must be accepted by all individuals"); *Wilton Reassurance Life*

---

[9]    M.S. and A.D. do not argue that the choice-of-law provision is unenforceable. *See* Opp. at 26.

*Ins. Co. of N.Y. v. Metoyer*, 2010 WL 11515323, at *4 (C.D. Cal. Jan. 22, 2010) (applying choice-of-law provision to the attempt "to void the Agreement").

The other—nonbinding—case that Plaintiffs cite, *R.A. v. Epic Games, Inc.*, 2019 WL 6792801 (C.D. Cal. July 30, 2019), is simply off base and an outlier on this point. There, the District Court for the Central District of California applied *Trans-Tec* and stated that the court could not apply the choice-of-law provision to the issue of disaffirmation. *Id.* at *5. But as M.S. and A.D. do here, the court conflated the issue of enforceability with that of formation. *See id.*

M.S. and A.D. have otherwise not disaffirmed the agreement because they leave open the possibility that they will continue to use their Switch consoles. *See C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015) (holding that minor cannot disaffirm part of a contract while simultaneously retaining another part of the contract). Although M.S. and A.D. now state that they have stopped using the consoles, they suggest that they will resume their use. *See* Opp. at 32 (asserting "additional costs in the future"); M.S. Decl., ECF No. 37-3 ¶ 11 (silent about future use); A.D. Decl., ECF No. 37-5 ¶ 11 (same). That is a key distinction because they retain the consoles and Nintendo does not know whether and when they might use the products again. *Cf. Doe*, 435 F. Supp. 3d at 1037 (concluding that the plaintiff disaffirmed because he "has not played the Fortnite game after filing of the lawsuit" *and* "has no intention of playing Fortnite in the future"); Wash. Rev. Code § 26.28.030 (requiring the return of products).

M.S. and A.D. also do not dispute that the EULA required them to be at least 18 years of age. *See* Opp. at 27. Their misrepresentation that they were of majority means that they cannot disaffirm. *See* Wash. Rev. Code § 26.28.040.[10] They argue only that they did not read the entire EULA to review that requirement and assert incorrectly that the requirement was "[b]uried." Opp. at 18. But even though M.S. and A.D. are minors, they are still held to their agreements even if they did not read the terms. *See G.G.*, 799 F. App'x at 558 (holding that even where minors were involved, "courts presume that parties to an agreement have read . . . the entire contract" (quotations omitted)). And the requirement was not buried; it is stated in the second sentence of

---

[10]   Nintendo recognizes that the law on this point has historically differed in California.

the EULA right after the notice that "THIS IS AN IMPORTANT AGREEMENT THAT
APPLIES TO YOUR USE OF THIS NINTENDO VIDEO GAME CONSOLE!" EULA at 1.

**G.     M.S. and A.D.'s New and Untenable Theories of Standing Do Not Permit Them to Withstand Dismissal.**

Finally, M.S. and A.D. argue that they have standing to pursue their asserted claims, even
though they did not purchase the Switch consoles and did not experience any personal economic
injury. Opp. at 30–35. But, as an initial matter and discussed above, M.S. and A.D. cannot rely on
facts newly asserted outside the Complaint to support standing. *See supra* § II.A; *Biodiversity
Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002) ("Standing is determined as of the
commencement of litigation."). Thus, even if Sanchez and Vierra can assign their statutory and
unjust-enrichment claims, they cannot do so now to manufacture standing for M.S. and A.D.[11] *In
re Schugg*, 688 F. App'x at  478–79 (rejecting argument that "changed factual circumstances"
provided "the standing necessary to assert the relevant claim"); *see also Dagher v. Ford Motor
Co.*, 238 Cal. App. 4th 905, 926 (Cal. Ct. App. 2015) (holding that "highly personalized rights"
under the Song-Beverly Act are "not assignable").

M.S. and A.D. also now contend that the alleged defect with the products that their parents
purchased "greatly impact[ed] the Products' value, severely limits [their] use of the Products, and
will require them to pay additional costs in the future." Opp. at 23. Not only is M.S. and A.D.'s
assertion of potential "additional costs" speculative, the diminution in value that they assert also
is not an economic injury to them personally because they did not purchase the products. *See,
e.g.*, *In re Sony Gaming Networks & Customer Data Security Breach Litig.*, 903 F. Supp. 2d 942,
966 (S.D. Cal. 2012) (holding asserted injuries too speculative); *Mayron v. Google LLC*, 269
Cal.Rptr.3d 86, 92 (Cal. Ct. App. 2020) ("[T]he relevant inquiry for standing purposes" under the
UCL "is whether a defendant's unlawful conduct caused the plaintiff to part with money");
*Amalgamated Transit Union, Local 1756, AFL–CIO v. Super. Ct.*, 46 Cal.4th 993, 1002 (Cal. Ct.

---

[11]  Although CLRA rights may be assignable, in the case on which M.S. and A.D. rely, the court
held that standing under the CLRA arose from a *purchase*, not an after-the-fact-attempt to
generate standing through assignment. *See In re Fluidmaster*, 149 F. Supp. 3d 940, 953 (N.D.
Ill. 2016). The case therefore does not support M.S. and A.D.'s theory.

1   App. 2009) (standing "requirement would be nullified if a person claiming injury . . . were

2   allowed to assign that claim to one who has suffered no injury"). The fact that M.S. and A.D. may

3   have asked their parents to buy them the consoles—another newly asserted "fact"—is beside the

4   point. *See* Opp. at 33; *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal.App.4th 949 (Cal. Ct.

5   App. 2005) ("[O]wnership of gifted property . . . does not automatically carry with it ownership

6   of the rights of the person who bought the gift.").[12] M.S. and A.D. acknowledge as much,

7   "request[ing] leave to amend to clarify their standing." Opp. at 33 n.9.

8          With regard to M.S. and A.D.'s declaratory-judgment claim, Nintendo did not argue, as

9   M.S. and A.D. appear to believe, that they do not have standing to pursue that claim. *See* Opp. at

10  31–32. Nintendo argued that they "cannot maintain" the claim because they have no agreement

11  with Nintendo and their allegations show that they cannot disaffirm. Mot. at 34. In any event,

12  M.S. and A.D. do not have standing to seek a declaratory judgment "invalidating" agreements

13  with "other minors." Opp. at 31. A minor cannot disaffirm an agreement between third parties.

14  *See I.B.*, 905 F. Supp. 2d at 1004 (holding that the right to disaffirm is personal). Thus, even if

15  M.S. and A.D. entered agreements that they can disaffirm, they cannot disaffirm for other minors

16  or represent minors who have not personally or validly disaffirmed the EULA.

17                          **III.   CONCLUSION**

18         For those reasons, Nintendo respectfully requests that the Court grant the relief requested.

19  DATED:  February 8, 2021                    **PERKINS COIE LLP**

20                                              By:  s/ Eric J. Weiss

21                                              Attorneys for Defendant
                                                NINTENDO OF AMERICA INC.
22

23

24

25

26

---

[12] In *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 948 (S.D.
27   Cal. 2016), the court declined to dismiss because the plaintiff alleged "lost sales, market share,
     and goodwill." *Id.* at 948. M.S. and A.D., of course, allege nothing of the sort.
28